■ MARY COLLINS, as Administratrix of the Estate of MAURICE COLLINS, Deceased, Respondent, v. STATE OF NEW YORK, Appellant. (Claim No. 36815.) — Per Curiam. The State appeals from a judgment of the Court of Claims in the amount of $22,334.27 for the wrongful death, by suicide, of the claimant's son while he was a patient at the Rockland State Hospital. On December 25, 1958, the attendant in charge of the ward in which the decedent was a patient found the door of the bathroom section of the ward closed. On entering he found the decedent slumped against a radiator under a window with a shoelace around his neck attached to a cord which was attached to the window. The decedent died on January 6, 1959. A supervising psychiatrist of the hospital stated that the cause of death was " cerebral edema and cerebral congestion due to cerebral anoxia due to strangulation by hanging." In September of 1957 the decedent became depressed and was admitted voluntarily to Bellevue Hospital. About two weeks later he was transferred to Rockland State Hospital. In March of 1958 he was released on convalescent status but was returned on July 3, 1958, after his sister reported that he had attempted suicide by taking

thorazine tablets. In the hospital record on the date of his readmission there appeared the following two notes: "Observe for Suicide" and "depressed — observe for Suicide requires Considerable Supervision". The hospital record contains also an additional clinical note made by a supervising psychiatrist on July 11, 1958, which states: "Please caution employees about the possibility of this patient hoarding medication". The suicide attempt prior to readmission is also recorded. The decedent's condition was diagnosed as dementia praecox, paranoid type. After readmission the decedent escaped in September of 1958 but later returned voluntarily. He had been granted the privilege of walking about the grounds if accompanied by another patient until his escape in September but, on his return after this escape, the privilege was revoked. Although the hospital had a special maximum security building for suicidal patients, the decedent was never admitted to this building but was assigned to a general ward. The supervisor of the building containing the ward to which the decedent had been assigned was not aware of the decedent's suicidal tendencies recorded in the hospital record. The claimant's medical expert testified that more precaution should have been taken to prevent the suicide. A doctor who was at the time of the trial assistant director of the hospital testified, not from personal knowledge but solely by hospital records, that the decedent's condition had not warranted further precautions but admitted on cross-examination that he had not before seen the notations in the hospital record of the decedent's suicidal tendencies. The attendant in charge of the decedent's ward, which contained approximately 60 patients, was not called as a witness. The court said: "While the supervisor testified that he saw the decedent in the dayroom that evening at 11:30 P.M., the accident report of the only attendant on duty in the ward makes no mention of that fact. We find it hard to believe that in a matter of ten minutes the decedent went to the night section, attempted suicide and was found in such condition that the ward attendant reported that 'I thought he was dead.' On all the credible evidence, we find that the last time any particular attention was paid to the decedent was at 9:15 P.M., that evening as stated on the ward attendant's accident report." With respect to the quotation above we see no reason to disturb the judgment of the court as to appraisal of the credibility of the witness and as to determination of the factual issue. The court also said: "While the decedent apparently had shown some signs of improvement prior to his two elopements, the hospital record following these two attempts evidences the fact that the decedent was in a disturbed state and depressed. We find no competent evidence in the record of any medical judgment that the decedent was no longer subject to suicidal tendencies. No reason is given why in the light of his history he was placed in a ward with patients not considered dangerous and those charged with his every day care had no knowledge of these suicidal tendencies." The claimant's doctor testified that the decedent should have been placed under more severe restrictions. It seems apparent that, had any precautions been taken, the chance of suicide would have been reduced. We find that the State, although having recorded knowledge of the decedent's suicidal propensities, failed to use due care in the circumstances by failing to take reasonably adequate precautions to prevent the suicidal act and that proximate cause is properly inferable. The negligence of the State is not confined merely to the assignment of the decedent to a general ward but lies rather in the failure to exercise general proper precautions with a patient of known and recorded suicidal tendencies. Despite such known and recorded tendencies the record is devoid of any evidence to indicate that any precautions whatever were taken. The decedent was 23 years of age. The claimant's medical expert testified that prognosis was good, that the decedent had a 50% chance of recovery and would

in his opinion have had at least periods of remission equal to half his life expectancy, during which periods he would have been able to perform " useful services in the commercial world ". Prior to hospitalization he resided with his mother, the claimant. He earned $60 weekly in his last occupation and generally contributed $25 to " the household ". His mother was 51 years of age at the time of his death. Her life expectancy at that time may be estimated as approximately 20 years. The court awarded with appropriate interest $18,992, which included funeral expenses of $992. We consider this award excessive. Judgment modified, on the law and the facts, so as to reduce the award to $8,492 and appropriate interest, and, as so modified, affirmed, without costs. Taylor, Aulisi and Hamm, JJ., concur; Herlihy, J. P., dissents and votes to reverse, in the following memorandum, in which Reynolds, J., concurs: This claim does not come within the ambit of liability where awards have been permitted as the result of suicidal acts of patients committed to a State institution. Procedurally, the record is somewhat confused and is considered first. The action was tried on March 20, 1963 and after the claimant rested, the State moved to dismiss on the grounds that a " prima facie case of negligence " was not established. The motion should have been granted but the court reserved and the State proceeded with its proof. Thereafter, on June 13, 1963 the court granted a motion to reopen to permit medical proof " concerning the prognosis in connection with the mental condition " of the decedent. Medical testimony was offered by the claimant and by the State and the motion was then renewed to dismiss the claim and, in my opinion, it should have been granted. As to the merits, the court found: " No reason is given why in the light of his history he was placed in a ward with patients not considered dangerous and those charged with his every day care had no knowledge of this suicidal tendencies. This was not a proper place for a patient who had such tendencies. The State failed to use reasonable care under the circumstances to protect the decedent against himself and the negligence of the State was the proximate cause of his death ", and this court is finding " [T]hat the State, although having recorded knowledge of the decedent's suicidal propensities, failed to use due care in the circumstances by failing to take reasonably adequate precautions to prevent the suicidal act and that proximate cause is properly inferable ". Claims involving this type of litigation, while arousing sympathy, have quite strictly limited liability to either a violation of a rule or lack of proper and adequate supervision, the result of which was the proximate cause of the suicide. *Szostak* v. *State of New York* (20 A D 2d 828) might be an exception to the general principle where an exposed pipe in a room in a closed ward was considered negligence. The majority in this court relies heavily upon the fact that the supervisor of the building testified that he had never examined the hospital record of the decedent. The record contained statements, in sum, to the effect that the patient had suicidal tendencies and that employees should be cautioned against the possibility of the patient hoarding medication. Aside from the suicidal tendency, the legend in the record is in no way proximate to the death herein. The findings imply that the decedent should not have been in the type of ward to which he was assigned, but rather to a suicidal ward. It is general knowledge nowadays that this type of patient, rather than being restricted to such a ward, is gradually afforded the opportunity to make adjustments within the confines of the institution. If the negligence of the State is to be predicated on such a narrow issue, there is the possibility of a conflict with the recommended medical therapy. The claimant's doctor testified: " I would say that the majority of people are potential suicides, normal or abnormal ". A detailed examination of his testimony does not sustain in

any respect the findings of the Court of Claims or of this court and there is no testimony in this record to sustain a finding that the ward was not proper for the decedent. "An ingenious patient harboring a steady purpose to take his own life cannot always be thwarted." (*Hirsh* v. *State of New York,* 8 N Y 2d 125, 127.) The record establishes that there were no suicidal tendencies prior to his fatal act, while a patient in the institution, and unless the State is to become an insurer, there should be no relaxation of the established principles of liability. Aside from the procedural snarls, a reading of the entire record does not justify a finding of negligence and "that proximate cause is properly inferable" as found by the majority. To the contrary, there is a reasonable basis in law and in fact for the treatment accorded the decedent. The judgment should be reversed and the claim dismissed.